IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HELEN RUMLEY-CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:16-cv-00047-TMP |
| ) | |
| THE RESOURCE GROUP, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION**

This cause is before the court on the motion for summary judgment filed October 9, 2017, by the defendant, The Resource Group ("Defendant"). (Doc. 35). The Resource Group seeks dismissal of all of Helen Rumley-Cunningham's ("Plaintiff") claims arising from Defendant's alleged race discrimination in failing to hire her for a management position. This matter has been fully briefed, and the court has considered the evidence and arguments set forth by both parties. The parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 21).

# SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R.

Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 246. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination. See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence

on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## FACTS

Viewing the facts in the light most favorable to the nonmovant, in this case the plaintiff, the following facts are relevant to the motion for summary judgment.

The Resource Group was formed in 2012 and provides services to health systems, including St. Vincent's Health System ("St. Vincent's"). Plaintiff is an African-American female who was employed by St. Vincent's from 2012 to 2016. Plaintiff began her employment with St. Vincent's as a purchasing agent. It is undisputed that plaintiff excelled in her capacity as a purchasing agent and received a very complimentary performance evaluation. On July 10, 2012, plaintiff was evaluated by her supervisor, David Edwards, who gave her a glowing personnel evaluation.

In 2012, when The Resource Group began its work with St. Vincent's, the plaintiff was notified that her position as a purchasing agent would be phased out. Plaintiff applied for and received the position of Supply Store Supervisor at St. Vincent's East in July of 2013. As Supply Store Supervisor, plaintiff remained an

employee of St. Vincent's, but she was directly supervised by the Associate Manager over the Warehouse, who was an employee of The Resource Group. The Associate Manager over the Warehouse was directly supervised by Beth McMillian, the Manager of Operations, an employee of The Resource Group. McMillian was in turn supervised by David Edwards, Area Director for the Supply Chain for the Southeast, who reported to John Eaker, Area Vice President and Chief Resource Officer. McMillian, Edwards, and Eaker all were employees of The Resource Group.

During her tenure as Supply Store Supervisor, plaintiff also served as the Interim Associate Manager over the Warehouse because of a vacancy in that position. Plaintiff directly reported to McMillian in this capacity. Both parties agree that the relationship between plaintiff and McMillian was strained, and there was frequent conflict. Plaintiff testified that McMillian constantly raised her voice to her, belittled her in the presence of her subordinates, and checked behind her.

On or about January 7, 2014, plaintiff submitted her application The Resource Group for the permanent position of Associate Manager over the Warehouse. She had been notified of the job listing and encouraged to apply by John Eaker. Plaintiff had a phone interview with a recruiter and a follow-up in-

person interview with Edwards and Eaker[1] on January 17, 2014. During the application period, plaintiff continued to work as the Interim Associate Manager. In June of 2014, plaintiff received an email from David Edwards detailing some areas of needed improvement. Beth McMillian was copied on the email. This email instructed the plaintiff to communicate potential issues to management, attend morning "huddle" meetings, and to work toward accomplishing performance goals with a sense of urgency. Plaintiff admittedly did not attend morning "huddle" meetings on a regular basis.

Around mid-2014, not having heard anything for six months since her interview, plaintiff went to speak with Edwards and Eaker about the status of her application. At that time, plaintiff was informed that the company was going to hire another applicant for the Associate Manager over the Warehouse position. Edwards and Eaker were complimentary of the plaintiff's work. In November of 2014, a team inspected the Central Supply Store, where plaintiff was the supervisor, and gave a satisfactory report. McMillian, Edwards, and Eaker all offered the plaintiff congratulations in an email chain.

On December 23, 2014, plaintiff was evaluated by Beth McMillian. In the evaluation, she was rated as meeting expectations and requirements in her capacity as the Central Supply Store Supervisor. Also in December 2014, Eaker and

---

[1] Plaintiff states that her interview was with Edwards and Eaker only; however, some defense witnesses claim that Beth McMillian and Bill Henderson also were present.

Edwards visited the Warehouse. While they were there, plaintiff spoke to Eaker and Edwards and secretly recorded their conversation. Plaintiff learned at that time that The Resource Group was in the final stages of hiring another candidate. The Resource Group first sought to hire a white male; however, due to failed salary negotiations, he turned down the job. The Resource Group then offered the job to Carrie Roberts, a white female, who accepted the job and began her employment in April of 2015.

Plaintiff states that Edwards and Eaker were responsible for making the decision to hire Roberts instead of her.[2] At The Resource Group, the supervisors tasked with making the hiring decision would each submit a form to Human Resources stating which candidate they believed should be awarded the job. Human Resources would then make the hiring decision based upon the forms received from the supervisors.

Plaintiff voluntarily resigned her employment with St. Vincent's in April of 2016. Plaintiff received no formal discipline during her employment. The email from Edwards on June 16, 2014, is the only documented discussion between Plaintiff and her supervisors regarding substandard performance in her job. Plaintiff filed this action in 2016. In her original complaint she alleged

---

[2] The Resource Group interjects that McMillian and Bill Henderson also assisted in making the decision.

discrimination by white supervisors. However, during her deposition she clarified that she was only alleging that Beth McMillian had discriminated against her.

## DISCUSSION

Defendant seeks summary adjudication of plaintiff's 42 U.S.C. § 1981 claim. Defendant asserts that plaintiff has failed to prove a *prima facie* case of racial discrimination, but even if plaintiff has proven a *prima facie* case of discrimination, she has failed to show that the stated, non-discriminatory reasons for failing to hire the plaintiff was pretext, and that the real reason was violative of the Act.

### A. *Prima Facie Case*

The Civil Rights Act prohibits discrimination on the basis of race in the formation and enforcement of contracts. 42 U.S.C. § 1981(a). A refusal by an employer to enter into an employment contract is redressable under § 1981 if the decision is based on the race of the applicant. Patterson v. McLean Credit Union, 491 U.S. 164, 182 (1989). Employment claims brought under 42 U.S.C. § 1981 are analyzed by the court using the same requirements and analytical framework as claims brought under Title VII. Standard v. A.B.E.L. Servs, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir.

1999). A plaintiff asserting a failure-to-hire[3] claim using circumstantial evidence must show: "1) that she or he is a member of a protected class; 2) that she or he applied and was qualified for a job for which the employer was seeking applicants; 3) that despite her or his qualifications, she or he was rejected; and 4) that after this rejection the position remained open or was filled by a person not within the protected class." Welborn v. Reynolds Metals Co., 810 F.2d 1026, 1028 (1987) reh'g and reh'g *en banc* denied, 815 F.2d 717 (11th Cir. 1987) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

It is undisputed that the plaintiff is a member of a protected class, that she applied for an open position for which the employer was accepting applications, and that the position was filled by a person outside of the protected class. Plaintiff's *prima facie* showing, therefore, turns on whether she has demonstrated that she was qualified for the position. The plaintiff asserts that she was qualified for the position as demonstrated by the amount of time that she was allowed to remain in the position and the lack of formal disciplinary action against her while working in the Interim Associate Manager over the Warehouse position. The defendant asserts that the plaintiff was not qualified for the position because of her performance deficiencies.

---

[3] Though at first glance this may appear to be a failure to promote claim, it is a failure to hire due to the way that St. Vincent's and The Resource Group are aligned. The Resource Group employed managers, including the Assistant Manager over the Warehouse to operate the supply chain for the hospital. Those managers supervised subordinate St. Vincent's employees, including the Central Supply Supervisor.

The fact that plaintiff served in the position in an interim capacity makes this case analogous to cases where the plaintiff was discharged from a previously held position even though it is a failure-to hire-case. In cases where the plaintiff has held the position for a lengthy period, the McDonnell Douglas burden-shifting framework has been modified. Rosenfeld v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987) (citing Pace v. S. Ry. Sys., 701 F.2d 1383, 1386 (11th Cir. 1983), cert denied, 464 U.S. 1018 (1983)). In these cases, it is inferred that the plaintiff is qualified because the employer allowed the plaintiff to remain in the position. Pace, 701 F.2d at 1386 n. 7. Any dispute between the parties about the plaintiff's performance in her position can then be raised by the employer as a legitimate, non-discriminatory reason not to hire the plaintiff to assume the position on a permanent basis. Rosenfeld, 827 F.2d at 1495 n. 2.

The court believes that there is a genuine issue of material fact as to whether the plaintiff was qualified for the position of Associate Manager over the Warehouse. As a disputed material fact, the resolution of this issue is best left to the jury. Therefore, the court finds for the purposes of summary judgment that the plaintiff has made a *prima facie* showing of racial discrimination, and thus declines to grant summary judgment on that ground.

## B. Rebuttal and Pretext

Even if the plaintiff succeeds in making a *prima facie* showing of racial discrimination, the presumption of discrimination that is raised by the *prima facie* showing may be rebutted if the employer offers a legitimate, nondiscriminatory reason for not hiring the plaintiff. Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 254 (1981). To satisfy this burden, "the employer need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had *not* been motivated by discriminatory animus." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998) (quoting Burdine, 450 U.S. 248 (1981)) (emphasis added). The burden on the defendant is a burden of production, not a burden of proof. Burdine, 450 U.S. at 254-5 (1981).

In the case at issue, the defendant's proffered reasons for not hiring the plaintiff are the performance issues that occurred while she served in an interim capacity. There is evidence in the record, undisputed by the plaintiff, that the "stock-out" percentage[4] while she was working as the Interim Associate Manager over the Warehouse was above the tolerable level. Additionally, there is

---

[4] The "stock-out percentage" is the percentage of times the warehouse is not able to fill a request from hospital staff for supplies. Testimony in the case indicates that the defendant seeks to have available supplies at least 95% of the times requested so that a "stock-out percentage" of greater than 5% is unacceptable. See Defendant's Brief in Support of Summary Judgment, Doc. 36, ¶¶ 20-23, which were not disputed by the plaintiff (see Plaintiff's Response in Opposition to Summary Judgment, Doc. 45, p. 4).

undisputed evidence that the plaintiff was told to attend "huddle" meetings,[5] which she admittedly did not attend regularly. Plaintiff has argued that she was never told that the meetings were mandatory, but this is a matter of semantics. She admits that she was told by McMillan and Edwards that she should attend the huddle meetings. (See Doc. 37-4, p. 30 (Rumley-Cunningham Depo. pp. 119-121)). The plaintiff testified as follows:

> Q. And what did David Edwards tell you about these meeting?
>
> A. Well, when we initially sat down, it was a concern about trying to make the huddles because they start at 8:00 and they're pretty much done at 8:10. My concern was that we were doing the huddles I was going to the huddles when I could. Because we were short staffed because Lashonda Hinkle resigned, Tracy Pickett was no longer there, those became issues that I had to do the inventory for that morning. And if we don't have inventory done by a certain time, we don't -- the hospital does not get supplies.
>
> Q. Okay. So I take it from what you've just described that that's what you said. But what did David Edwards tell you about attending these meetings?
>
> A. He just basically said to try to make the huddle.
>
> Q. Well, what did Beth McMillan say to you about these immediates?
>
> A. She said you're going to go to huddle.

---

[5] "Huddle meetings" were regular meetings every morning of various members of the hospital staff, including representatives of the supply-chain staff from the warehouse, to discuss problems or issues anticipated for that day. The huddle meetings were usually short, lasting only about ten to fifteen minutes, and were attended by approximately thirty people from various areas of the hospital. *See* Doc. 37-4, pp. 30-31 (Rumley-Cunningham Depo. pp. 118-122).

> Q. And after she gave you that instruction, did you still miss the huddle meetings?
>
> A. I tried my best to make them. But at the end of the day I had to make the decision do we get supplies or do I sit in a meeting that had nothing to do with me.

Doc. 37-4, pp. 30-31 (Rumley-Cunningham Depo. pp. 120-121).

The plaintiff had clear instructions from two of her supervisors to attend the morning huddle meetings, yet, on occasion, she decided not to attend the meetings, making the calculation, despite her instructions, that it was better to attend to the warehouse supplies than to attend the meetings. While the plaintiff was not disciplined for failing to attend the meetings, her supervisors could reasonably have viewed the plaintiff's failure to attend the "huddle" meetings, in spite of being instructed to do so, as insubordinate or uncooperative regardless of whether she was specifically told they were mandatory. Additionally, it is apparent that the email from David Edwards on June 16, 2014, is clear evidence that plaintiff's attendance at the "huddle" meetings was mandatory. (Doc. 37-4, p. 111 (Ex. 16 to Rumley-Cunningham Depo)).

Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th

Cir. 1998), reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). She must show not only that the articulated reason is false, but also that the true reason for not hiring her was discriminatory. See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). It is not the duty of this court to evaluate whether the decision not to hire plaintiff was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Moreover, courts have recognized that the discrimination laws should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential." Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

Plaintiff attempts to show that the defendant's articulated reasons for not hiring her are pretext in three ways: (1) she was never formally disciplined while serving as Interim Associate Manager, (2) she received a positive performance evaluation, and (3) she was never placed on a performance improvement plan. The problem with plaintiff's attempts to prove pretext is that her evidence does not show that the employer's articulated reasons for not hiring her are false, much less that the real reason was discrimination. She misunderstands the nature of the

employment decision made by the defendant. The question at that time was not whether, as Interim Associate Manager, the plaintiff should have been disciplined for the shortcomings in the warehouse. Rather, the employment decision being made was whether to *hire* the plaintiff to the permanent position of Associate Manager. Certainly, an employer can reasonably and legitimately conclude that an employee, while not deserving discipline, simply is not the best candidate to fill a permanent position based on the employee's temporary performance of the job. Whether she was formerly disciplined or not, the evidence shows that she was instructed to attend the weekly "huddle" meetings, yet she did not do so as instructed. Plaintiff does not dispute that she was instructed to attend the meetings and admits that she did not attend. Additionally, plaintiff was instructed to work with a sense of urgency toward correcting performance issues. Plaintiff presents no evidence that she worked toward improving fill percentages or reducing stock outs. In fact, plaintiff admits that her fill percentages were below the target of 95 percent.[6] Thus, the mere fact that the defendant chose not to discipline the plaintiff for her job performance does not refute the defendant's conclusion that she was not the best candidate to hire for the permanent position.

---

[6] In the defendant's brief in support of summary judgment, at paragraph 23 of the Statement of Undisputed Facts appears the following: "When plaintiff worked in the Supervisor and Interim Manager jobs, the fill rate was well below the 95 percent acceptable rate, meaning that the stock-out rate was greater than 5 percent (Ex. C, p. 31 ll. 13-23;)." (Doc. 36, p. 7). In her response to the defendant's motion and brief, the plaintiff expressly admits that paragraph 23 of the defendant's Statement of Undisputed Facts was, indeed, "Undisputed." (Doc. 45, p. 4).

Plaintiff also presents two performance evaluations, both of which rated the plaintiff as meeting standards. The first performance evaluation is dated July 10, 2012. Plaintiff was working in a completely different capacity at that time, so the court finds this document irrelevant to the case. The second performance evaluation was performed by Beth McMillian and dated December 23, 2014. This performance evaluation clearly states that the plaintiff "[met] the requirements for Central Supply Supervisor." The evaluation gives no indication that the plaintiff was being evaluated in her role as an Interim Associate Manager. Once again, however, even if the plaintiff was assessed to be performing adequately as the Interim Associate Manager, this does not mean that she necessarily was the best candidate to hire for the permanent position or that the defendant's conclusion that another candidate was better was false or the product of discrimination. Therefore, the court declines to find that this performance evaluation sufficiently rebuts the defendant's asserted reasons for not hiring the plaintiff, nor does it prove that the real reason the plaintiff was not hired was discrimination.

The final piece of evidence presented by the plaintiff to show pretext is that she was never placed on a performance improvement plan. The court assumes for the purposes of summary judgment that this is true because it is undisputed. However, the court finds that, even if there was no formal performance improvement plan, there still is evidence in the record to support the defendant's

claim that Plaintiff was not hired due to performance issues. The lack of a performance improvement plan standing alone does not show that the defendant's articulated reasons for not hiring the plaintiff are not worthy of belief or that discrimination was more likely the reason. The employment decision at issue was the decision to hire another candidate rather than the plaintiff, allegedly because the defendant concluded that the other candidate was better. The defendant was not required to place her on performance improvement plan to make her a better candidate for the permanent job; it was only required to assess her candidacy for the job without racial animus. The absence of a performance improvement plan for the plaintiff does not refute or raise questions about the legitimacy of the defendant's assessment that there were better candidates for the permanent position.

Furthermore, the court takes note of plaintiff's acknowledgement that David Edwards and John Eaker were the decision-makers and that plaintiff has not alleged that Edwards or Eaker discriminated against her. The defense witnesses seem to disagree about who participated in plaintiff's interview, but all agree that Edwards, Eaker, McMillian, and Bill Henderson all submitted independent assessments to Human Resources as part of the hiring decision. Even if the court believes that McMillian did participate in the decision, she was one of four independent decision-makers, and no evidence has been presented to suggest that

McMillian influenced the other three decision-makers in any way. Absent evidenced that the decision-makers were motivated by racial animus, it cannot be said that the decision was the product of purposeful discrimination.

In short, plaintiff has failed to produce any evidence that shows that the stated reasons for not hiring the plaintiff were not the real reasons, or that the real reason for the hiring decision was related in any way to plaintiff's race. Accordingly, the Resource Group's motion for summary judgment is due to be granted.

## CONCLUSION

Based upon the foregoing undisputed facts and legal conclusions, the magistrate judge finds that the motion for summary judgment filed by the defendant (doc. 18) is due to be GRANTED, and that plaintiff's claims against this defendant are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered.

DATED the 13th day of September, 2018.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE